**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:06cr376** |
| | ) | **The Honorable John A. Gibney, Jr.** |
| **DARRYL G. INGRAM,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S MOTION TO REDUCE SENTENCE**
**PURSUANT TO THE FIRST STEP ACT OF 2018**

COMES NOW the Defendant, Darryl Ingram, by counsel,[1] and respectfully moves this Court pursuant to § 404(b) of the First Step Act of 2018 for an order reducing his total term of imprisonment from 384 (324 + 60) months to time served. This case was recently before this Court under a motion for relief pursuant to 18 U.S.C. § 3582(c), a reduction in Mr. Ingram's crack cocaine guidelines. This Court found that Mr. Ingram was eligible and deserving of a reduction. This Court also asked at the hearing whether it could reduce Mr. Ingram's sentence even lower than what the defendant requested.[2] Unfortunately, at the time, no further reduction could be granted under the law. Now, pursuant to the First Step Act, Mr. Ingram's sentence can be reduced – and reduced significantly.

If this Court recalls from the previous hearing in this case, a prominent local attorney, Chris Anderson, testified. His testimony spoke of the youthfulness of Mr. Ingram at the time of the offense and trial – he was a teenager when most of the conduct occurred - and Mr. Anderson

---

[1] Mr. Ingram's current release date is July 25, 2036.   His inmate registry number is 33102-183.
[2] *See* attached Hearing Transcript, July 31, 2018, at 15 ("Trans."), when the Court stated:
> THE COURT: When I looked at this thing I put my crack staff to work on answering the question of why we can't go lower, because, candidly, this guy was 22 at the time --
> MR. WAGNER: 19 at the time of the robbery.
> THE COURT: -- and it just didn't seem like being sentenced until he was in his 50s was the way things ought to go. But I am convinced now that I can't go any lower than . . . ."

believed that Mr. Ingram was not a serious offender, not a tough guy, but was "soft as butter," and fearful for himself and his family. Trans. at 6-7.  Mr. Anderson also testified that, because of the very harsh federal guideline sentence imposed on Mr. Ingram in this case, Mr. Anderson lost the desire to practice criminal defense in the federal court because of the Draconian and disproportionate impact such prosecutions had on people of color. *Id*. at 12.  He refused to be a part of that process.

The First Step Act allows this Court to impose a sentence below the disproportionate guidelines imposed in this case and others like it, and allow some measure of reasonableness and fairness into the process.  Additionally, Mr. Ingram has performed very well while incarcerated which should weigh in favor of significant First Step Act relief.

Specifically, had the 2010 Fair Sentencing Act been in effect at the time of Mr. Ingram's conviction in 2007, that conviction would have been classified under 21 U.S.C. § 841(b)(1)(B) rather than under 21 U.S.C. § 841(b)(1)(A), and Mr. Ingram would have faced a statutory maximum of 40 years rather than Life.  Because the 2010 Fair Sentencing Act modified the statutory penalties applicable to his statute of conviction, Mr. Ingram is eligible for a reduced sentence pursuant to the First Step Act of 2018.  Under an 18 U.S.C. § 3582(c) crack cocaine retroactivity motion in 2018, this Court exercised its discretion and reduced Mr. Ingram's crack cocaine sentence from 360 months to 324 months, based on a change in the federal sentencing guidelines.  Moreover, Mr. Ingram is today a very different person than he was when he committed the offenses that led to his incarceration.  Accordingly, he respectfully requests that the Court reduce his sentence from 408 months (324 + 84) to time served.

**A. First Step Act: Background and Requirements.**

On December 21, 2018, the First Step Act of 2018 was signed into law. *See* First Step Act of 2018, Pub. L. 115-391, § 404(b), 132 Stat. 5194, 5222 (2018).   Section 404 of this new law makes the Fair Sentencing Act of 2010 retroactively applicable to defendants who committed controlled substance offenses before that law's enactment on August 3, 2010.   The Fair Sentencing Act altered the quantities of cocaine base subject to the penalty provisions of 21 U.S.C. § 841(b)(1)(A)-(C).   Specifically, the quantity triggering the ten-year mandatory minimum was increased from 50 grams of cocaine base to 280 grams, and the quantity triggering the five-year mandatory minimum was increased from five grams of cocaine base to 28 grams of cocaine base. *See* 21 U.S.C. §§ 841(b)(1)(A), (B).   *See* Fair Sentencing Act of 2010, Pub. L. No. 111-220, 124 Stat. 2372 (2010).

Section 404(b) of the First Step Act of 2018 provides that defendants who were subjected to mandatory minimum penalties that were subsequently modified by the 2010 FSA may move for a reduced sentence.   First Step Act § 404(b).   Specifically, the section provides that in the cases for defendants previously sentenced,

> [a] court that imposed a sentence for a covered offense may, on motion of the defendant . . . , impose a reduced sentence as if Sections 2 and 3 of the Fair Sentencing Act of 2010 (Public Law 111-220; 124 Stat. 2372) were in effect at the time the covered offense was committed.

First Step Act § 404(b); *see id*. § 404(c) (stating that "[n]othing in this section shall be construed to require a court to reduce any sentence pursuant to this section").   Section 404 defines "covered offense" as "a violation of a Federal criminal statute, the statutory penalties for which

were modified by section 2 or 3 of the Fair Sentencing Act of 2010 (Public Law 111- 220; 124 Stat. 2372), that was committed before August 3, 2010."   First Step Act § 404(a).

      **1.  A defendant's eligibility for a reduction under § 404 turns solely on the statute of conviction, not the nature of the defendant's conduct.**

Eligibility for a reduced sentence under the First Step Act "turns on the proper interpretation of a 'covered offense.'"   *United States v. Wirsing*, 943 F.3d 175, 185 (4th Cir. 2019).   In *Wirsing*, the Court resolved the question of whether classification as a "covered offense" depends upon (A) whether the penalties of a federal criminal statute the defendant violated were modified by the Fair Sentencing Act; or (B) whether the amount of drugs involved in a defendant's offense conduct exceeded the new thresholds set forth in the Fair Sentencing Act. *Id*.

The Fourth Circuit held that a "covered offense" is defined solely by whether the statutory penalties for a violation of a federal criminal statute were modified by the Fair Sentencing Act. *Wirsing*, 943 F.3d at 185-86.   The eligibility determination is thus based on "a simple interpretation of the statute:" a defendant "is eligible to seek relief under the First Step Act" if "'before August 3, 2010,' he 'committed' a 'violation'" of a federal criminal statute, "and 'the statutory penalties' for that statute 'were modified by' Section 2 of the Fair Sentencing Act." *Id*. at 186.   In so ruling, the Fourth Circuit adopted the "consensus view" among federal courts that eligibility does not depend upon the amount of drugs involved in a defendant's particular offense conduct.   *Id*. at 184.

Further, under *United States v. Gravatt*, ___ F.3d ___, 2020 WL 1327200 (4th Cir. 2020), the Fourth Circuit found that even though a 5 kilogram powder cocaine charge was alleged in conjunction with a 50 gram crack cocaine charge in a dual-object conspiracy indictment, the

-4-

defendant was convicted of a "covered offense," and was found to be eligible for First Step Act relief.   Because of the 5 kilogram powder cocaine component, the statutory mandatory minimum sentence exposure did not change for the defendant.   The Fourth Circuit, nonetheless, found that since the statutory penalties were still modified for the 50 gram crack cocaine conspiracy, the defendant was subject to a covered offense, and remained eligible.   This demonstrates that the Fourth Circuit has taken an expansive view of First Step Act eligibility; eligibility should not be an issue in this case.   Mr. Ingram was convicted of a covered offense.

**2.  After finding a defendant eligible for a reduced sentence, § 404 does not limit the Court's discretionary authority to impose a lower sentence.**

Upon a finding of eligibility, § 404 expressly permits a court to "impose a reduced sentence" "as if" the Fair Sentencing Act "were in effect."  First Step Act § 404(b).  At the same time, §404 gives the court discretion to deny the motion of a defendant who is eligible and whose sentence is not already fully in accordance with the Fair Sentencing Act, so long as the court denies the motion "after a complete review … on the merits."  *See* First Step Act § 404(c). Section 404 places no other limit on the extent to which the court may reduce a sentence, and places no restriction at all on what the court may consider in imposing a reduced sentence.   Put another way, if a defendant is eligible under § 404(a) and (b) because he was previously sentenced for a covered offense, the district court decides in its discretion whether, and to what extent, to impose a reduced sentence. In doing so, the court considers the applicable statutory limits, the advisory guideline range, and the § 3553(a) purposes and factors, including the need to avoid unwarranted disparities between defendants "with similar records who have been found guilty of similar conduct," and the defendant's post-sentencing conduct.

Thus, "unlike earlier rounds of retroactive crack or other drug sentencing relief, the First Step Act does not impose any artificial or guideline limits on a reviewing court."  *United States v. Boulding*, 379 F. Supp. 3d 646, 653 (W.D. Mich. 2019).  Indeed, "[t]he limits of 18 U.S.C. §3582(c)(2) [that apply to retroactive guideline amendment reductions] are inapplicable.  The only limits found in the First Step Act are the statutory minimums of the Fair Sentencing Act's new thresholds."  *Id*.

In sum, to be eligible for a discretionary sentencing reduction, a defendant need meet only three requirements: (1) he was convicted of a covered offense committed before August 3, 2010; (2) he was sentenced pursuant to the statutory penalties for the covered offense in effect before August 3, 2010; and (3) he has not previously filed a motion pursuant to § 404 that was denied on its merits after a complete review.  Mr. Ingram meets these three requirements.  Accordingly, the Court has the discretion to impose a reduced sentence in this case.

Additionally, in assessing whether relief is appropriate and to what extent relief should be granted, this Court may apply a one-to-one ratio between crack and powder cocaine in this case.  According to research and opinions on the topic, the disparity between crack and powder cocaine has been discredited as there is no reasoned basis for using the 18-to-1 ratio adopted by the Fair Sentencing Act, and because the crack-powder disparity continues to disproportionately affect people of color, such as Mr. Ingram.  *See*, *e.g.*, Remarks of A.G. Holder, "Rethinking Federal Sentencing Policy: 25th Anniversary of the Sentencing Reform Act," June 24, 2009 ("This Administration firmly believes that the disparity in crack and powder cocaine sentences is unwarranted, creates a perception of unfairness, and must be eliminated."); ACLU, *With the Stroke of a Pen, A Fairer Criminal Justice System*, August 3, 2010,

http://www.aclu.org/blog/drug law reform/stroke pen fairer criminal justice system (calling the crack-powder disparity "one of the most dysfunctional and needlessly cruel aspects of the federal criminal justice system"; and advocating for the "eventual total elimination of this unjust disparity").   If this Court is to consider imposing a one-to-one ratio of crack to powder cocaine, Mr. Ingram's guidelines would be reduced from a base offense level 32 to a level 24.   Even with a CHC VI, with a 4-level increase for a firearm (+2) and obstruction (+2), Mr. Ingram's guideline range would be 140-175 months for his drug offense (offense level 28).[3]

### 3.   Mr. Ingram Is Eligible for a Sentence Reduction Pursuant to the First Step Act.

On October 17, 2006, Mr. Ingram was charged with conspiracy to possess with intent to distribute 50 grams or more of cocaine base, in violation of Title 21, U.S.C. § 846. In a superseding indictment filed on January 17, 2007, Mr. Ingram was charged with the same conspiracy count and additional counts alleging (1) conspiracy to interfere with commerce by threats and violence, in violation of Title 18, U.S.C. § 1951; (2) interference with commerce by violence, in violation of Title 18, U.S.C. § 1951; and (3) possession of a firearm in furtherance of a crime of violence, in violation of Title 18, U.S.C. § 924(c).   On February 1, 2007, the government filed for an enhancement under Title 21, U.S.C. § 851 based on a prior drug conviction from 2006, which subjected Mr. Ingram to a mandatory minimum 240 months if convicted on Count One.[4]   The defendant proceeded to trial by jury and Mr. Ingram was

---

[3]  If Mr. Ingram's CHC is reduced to Level IV, as suggested below at p. 11, his suggested powder cocaine drug guidelines would fall to 110-137 months.

[4]  Judge Lauck, in a First Step Act opinion, had some very critical things to say about the government's historical use, or abuse, of the § 851 enhancement.   *See United States v. Hardnett*, 417 F.Supp.3d 725, 728, n.1 (E.D.Va. 2019) (Lauck, J.).   In *Hardnett*, Judge Lauck referred to the § 851 enhancement as follows:

convicted on all four counts. The advisory guideline range in the Presentence Report ("PSR") was 360 months to Life on the first three counts (with a statutory maximum of 240 months on Counts 2 and 3), and a consecutive sentence of 84 months for the firearm/violent offense count. On July 6, 2007, the Court imposed a sentence of 444 months of imprisonment, consisting of 360 months on Count One, 240 months, concurrent to Count One, on Counts Two and Three, and 84 months, consecutive to Count One, on Count Four.

---

One court has called this § 851 enhancement "a uniquely powerful prosecutorial cudgel: it allows the Government, at its sole discretion, to file an additional charge by information that a defendant has been previously convicted of a drug trafficking offense thereby ratcheting up the mandatory minimum applicable from 5 to 10 years, or 10 to 20 years, or 20 years to life." *United States v. Pierre*, 372 F. Supp. 3d 17, 20 n.1 (D.R.I. 2019). And this "staggering" increase must be imposed by the Court when the prosecution files the 851 enhancement. Sarah French Russell, *Rethinking Recidivist Enhancements: The Role of Prior Drug Convictions in Federal Sentencing*, 43 U.C. DAVIS L. REV. 1135, 1163 (2010) ("If a prosecutor seeks the 851 enhancement, the judge must apply it.").

The use of this enhancement varies, to a troubling degree, by administration. The *Pierre* Court observed that "during the administration of Attorney General Ashcroft, local U.S. Attorney's Offices were directed as a matter of policy to charge the offense that would generate the most substantial sentence under the Sentencing Guidelines and were strongly encouraged to use statutory enhancements, including under § 851, in all appropriate cases." *Pierre*, 372 F. Supp. 3d at 20 n.1 (quoting Mem. from Att'y Gen. John Ashcroft Setting Forth Justice Dep't Charging and Plea Policies (Sept. 22, 2003), reprinted in 16 Fed. Sent. R. 129 (Dec. 1, 2003)). The *Pierre* Court continued by noting that "[s]ince around 2008, in this Court's experience, the use of the § 851 cudgel has been mercifully rare." 372 F. Supp. 3d at 20 n.1. A 2018 United States Sentencing Commission Report similarly reported that § 851 enhancements were inconsistently applied, adding that it appeared to be more frequently invoked against African American offenders. U.S. SENTENCING COMMISSION APPLICATION & IMPACT OF 21 U.S.C. § 851: ENHANCED PENALTIES FOR FEDERAL DRUG TRAFFICKING OFFENDERS, (2018), Report-At-A-Glance, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/backgrounders/RG-851-mm.pdf.

In March of 2018, Mr. Ingram moved this Court for relief under the crack cocaine retroactivity provisions, 18 U.S.C. § 3582(c).   After a hearing on the motion, this Court reduced Mr. Ingram's sentence from 444 months to 408 months, the maximum reduction allowable under the law.   Pursuant to the First Step Act, the defendant now requests that the Court reduce his total sentence to time served. As demonstrated in the attached Progress Report, Mr. Ingram's conduct and programming while incarcerated for the past 14 years in federal prison have been excellent.   He is deserving of the sentence reduction he seeks.

Mr. Ingram is cognizant of the fact that his robbery convictions involve sentences of 240 months, with a consecutive 84 months for the § 924(c) conviction.   This Court should be aware that the guidelines for his robbery charges were at an offense level 23 (PSR, Worksheet A), CHC VI, which produces a guideline range of 92-115 months.   Had Mr. Ingram's crack cocaine offense sentence been less than 240 months, the Court would not, in all likelihood, have imposed a sentence on the robbery charges so far in excess of the sentencing guidelines.   As Mr. Ingram has been incarcerated since August of 2006 on his present charges (PSR at p. 2), he has been incarcerated for approximately 164 months.   Based on Bureau of Prisons calculations, that sentence served would amount to the equivalent of an imposed sentence of 192 months, considering that inmates serve 85% of their imposed time.   The low end of Mr. Ingram's robbery guidelines (92 months) plus the firearm charge (84 months) would amount to an imposed sentence of 176 months.   A drug sentence of 108 months, in addition to the 84-month firearm sentence, would be the equivalent of a time-served sentence for Mr. Ingram, 192 months.

Under the Fair Sentencing Act of 2010, the quantity of cocaine base alleged in the count of conviction, 50 grams, would result in a maximum sentence of 40 years, with a 5-year

mandatory minimum, rather than a range of 10 years to life.   Further, Mr. Ingram has not previously moved for a reduced sentence pursuant to § 404 of the First Step Act.   Nor has he previously had his sentence reduced as if the Fair Sentencing Act of 2010 applied in his case.

In sum, because Mr. Ingram was convicted of a covered offense, 21 U.S.C. § 846, and was sentenced pursuant to the statutory penalties in § 841(b)(1)(A) in effect at the time of the offense in 2006, before the Fair Sentencing Act of 2010 became law, and because he has not previously moved for or received a reduction under the First Step Act of 2018, he is eligible for a sentence imposed in accordance with the Fair Sentencing Act of 2010.

**B.  The Court Should Exercise Its Discretion to Reduce Mr. Ingram's Sentence.**

At his sentencing hearing in 2007, the Court sentenced Mr. Ingram to a sentence of 360 months plus 84 months.   In 2018, this Court reduced Mr. Ingram's 360-month sentence to 324 months pursuant to 18 U.S.C. § 3582(c).   Mr. Ingram's advisory federal sentencing guideline range is 324 - 365 months, and he faces a mandatory minimum sentence of ten years rather than twenty.   *See* Probation Worksheet, ECF Doc. 201.

Mr. Ingram has not previously moved for a reduced sentence pursuant to § 404 of the First Step Act.   Nor has he previously had his sentence reduced as if the Fair Sentencing Act of 2010 applied in his case. Under the Fair Sentencing Act of 2010, Mr. Ingram's maximum sentence would still be life under the 21 U.S.C. § 851 enhancement; however, under Section 401 of the First Step Act, the § 851 enhancement would no longer apply today.   Mr. Ingram's prior drug offense relied upon by the government for its § 851 predicate was not a "serious drug felony;" it was not a conviction for which Mr. Ingram was sentenced to more than 12 months of actual imprisonment. *See* PSR ¶ 55. Additionally, had Mr. Ingram entered a guilty plea, and

-10-

decided not to compel the government prove its case, his guidelines would have been an offense level of 33, CHC VI, with a range of 235-293 months (base offense level 32, +2 for firearm, +2 for obstruction, -3 for acceptance).

Mr. Ingram's criminal history mostly involved low-level convictions and just reached the 13 points – the minimum for a level VI category.  *See* PSR Worksheet C.  It also included a 1-point enhancement for the offense occurring less than 2 years after release from the previous incarceration which no longer applies.  *Id*.; USSG § 4A1.1(d).  The countable 1-point offenses in the PSR included a (1) disorderly conduct – a juvenile adjudication, a (2) B&E – also a juvenile adjudication which resulted in $50 restitution and probation, (3) misdemeanor identity fraud – which involved a $100 fine, and (4) failure to appear.  The 2-point offenses included a (1) grand larceny auto in 2003 for which he received all suspended time, (2) a failure to appear, and (3) contempt of court.  The distribution of cocaine charge relied upon for the § 851enhancement involved .294 grams of cocaine, and was relevant conduct so it did not score any criminal history points.  PSR ¶ 55.  There were no 3-point offenses in Mr. Ingram's criminal history.  Arguably, this is more a criminal history of a level III or IV offender.  As a CHC level IV offender, with an offense level 33, Mr. Ingram's guidelines would fall in the 188-235 months.

Mr. Ingram has exhibited strong post-sentencing conduct. Notwithstanding two minor incidents from 2019, he had a single disciplinary infraction in 2009 for "Using Martial Arts/Boxing" during his 14-year federal prison sentence.  He has had no infractions in the past 9 months.  *See* attached Progress Report.  Mr. Ingram's work has included employment as an orderly and he has been volunteering as a suicide companion.  *Id*. at 1.  Mr. Ingram's

-11-

programming has included more than 75 classes, which have involved over 250 hours of training in the culinary arts.  *Id*. at 2-4.  He earned his GED in 2010.  Mr. Ingram's time spent in federal prison indicates a strong desire to improve himself, to help others, and to prepare for life after federal prison.

When this Court reviewed Mr. Ingram's case almost 2 years ago, the principal concern seemed to be that the Court could only reduce Mr. Ingram's sentence by 36 months, leaving a 408-month sentence to be served.  *See* attached Trans. at 15.  Congress has provided another opportunity for Mr. Ingram, and the defendant wants to assure the Court that he will not waste the opportunity if the Court further reduces his sentence.   He is determined to make significant changes in his life when released.

As the Court may recall from his previous pleadings to the Court, Mr. Ingram had a very troubled upbringing. His mother was addicted to crack cocaine and heroin; he had very little exposure to his father. PSR at ¶65. Since the last hearing in this case, Mr. Ingram reports that his mother and his sister – who attended the hearing - have passed away.  Mr. Ingram plans to use the culinary skills he has learned in prison to obtain employment when released.

Although Mr. Ingram's actions were serious and unquestionably wrong, it is inherently unjust to continue to subject him to a sentence of more than 30 years from now for his offenses committed mostly as a teenager.

### *The sentencing of a youthful offender is necessarily different.*

The Supreme Court in four Eighth Amendment decisions—*Roper v. Simmons*, *Graham v. Florida*, *Miller v. Alabama*, and *Montgomery v. Louisiana* - have fundamentally reshaped the manner in which courts treat children in our criminal justice system.  As Mr. Ingram's offense

conduct was committed as a youthful offender, these matters should be factored into the Court's consideration of this case.  As the Supreme Court has found, youthful offenders are categorically less culpable than adults for their actions.

In *Miller v. Alabama*, the Supreme Court required lower courts to consider the "hallmark" attributes of youth—including immaturity, impulsivity, the inability to extricate themselves from their home environments, no matter how dysfunctional, susceptibility to peer and family pressure, and the inability to foresee risks and consequences.  *Miller v. Alabama*, 567 U.S. 460, 477 (2012).  Because of their diminished culpability and their great capacity to change and rehabilitate, young people cannot be held to the same standard as adults.

*Graham* held that because young persons' personalities are still developing and capable of change, the imposition of an extremely harsh penalty that afforded no opportunity for release was developmentally incongruous and constitutionally disproportionate.  *Graham v. Florida,* 560 U.S. 48, 78 (2010).  The Supreme Court has relied upon an increasingly settled body of research confirming that "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds." *Graham*, 560 U.S. at 68; *see also Miller*, 132 S. Ct. at 2464 n. 5 ("[T]he science and social science supporting *Roper* and *Graham*'s conclusions have become even stronger").

The Court has found that young persons have a lack of maturity and an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking." *Miller*, 132 S. Ct. at 2464 (internal citations omitted).  Leading psychological researchers have concluded that "even when adolescent cognitive abilities approximate those of adults, youthful decision making may still differ due to immature judgment."  *See, e.g.*, Elizabeth S. Scott &

Laurence Steinberg, *Blaming Youth*, 81 Tex. L. Rev. 799, 813 (2003).    Neuroscientific research has similarly confirmed that adolescents have limited ability to coordinate the different brain regions needed for reasoning and problem solving. Kenneth J. King, *Waiving Childhood Goodbye: How Juvenile Courts Fail to Protect Children from Unknowing, Unintelligent, and Involuntary Waivers of Miranda Rights*, 2006 Wis. L. Rev. 431, 461 (2006).   In particular, the human brain's prefrontal cortex—which controls risk assessment, the ability to evaluate future consequences, and impulse control—does not fully develop until a person reaches his or her early 20s. Jay N. Giedd, *Structural Magnetic Resonance Imaging of the Adolescent Brain*, 1021 Annals N.Y. Acad. Sci 77, 77 (2006). Offenders under age 20 frequently "underestimate the risks in front of them and focus on short-term gains rather than long-term consequences." Barry Feld, *The Youth Discount: Old Enough to Do the Crime, Too Young to Do the Time*, 11 Ohio St. J. Crim. 107, 116-17 (2013).

The *Miller* Court stated, "children are more vulnerable . . . to negative influences and outside pressures, including from their family and peers; they have limited control over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings." *Miller*, 132 S. Ct. at 2464.  *Accord Graham*, 560 U.S. at 68; *Roper v. Simmons*, 543 U.S. 551, 569 (2005).   That youthful offenders are developmentally less capable than adults of making sound decisions when peer pressure is strong is widely accepted.  *See, e.g.,* Jay D. Aronson, *Brain Imaging, Culpability and the Juvenile Death Penalty,* 13(2) Psychol. Pub. Pol'y & L. 115, 119 (2007).   Researchers have also noted that environmental factors can also pressure youthful offenders to break the law:   "[A]s legal minors, [adolescents] lack the freedom that adults have to extricate themselves from a criminogenic setting." Laurence Steinberg & Elizabeth Scott, *Less*

*Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty*, 58 Am. Psychologist 1009, 1014 (2003).

The *Miller* Court also found, "a child's character is not as well formed as an adult's; his traits are less fixed and his actions less likely to be evidence of irretrievable depravity." *Miller*, 132 S. Ct. at 2464; *see also Roper*, 543 U.S. at 569-70; *Graham*, 560 U.S. at 68.   The elasticity of human development, particularly during the years of maturation from childhood into adulthood, is again well-supported by research.  *See, e.g.,* Alex R. Piquero, *Youth Matters: The Meaning of Miller for Theory, Research, and Policy Regarding Developmental/ Life-Course Criminology*, 39 New Eng. J. on Crim. & Civ. Confinement 347, 349 (2013) ("As juveniles . . . transition into early adulthood, there is a strengthening of self-regulation in the brain that is coupled with a change (or de-emphasis) in the way the brain responds to rewards.   This change is also consistent with the aggregate peak and eventual precipitous decline in delinquency and crime observed in very early adulthood").

These principles should not just apply to the child, but to a person who is a youthful offender at the time of his offense.  It should apply to Mr. Ingram as his offense conduct included membership in the conspiracy as a teenager, and robberies which occurred when he was a teenager.   A youthful offender's mind does not automatically change when he reaches his 18th birthday; his brain is still growing and maturing.   Mr. Ingram should not be held to the same standard as a fully mature adult for his criminal conduct.

### C. Conclusion

In sum, because Mr. Ingram was convicted of a covered offense, 21 U.S.C. § 846, and was sentenced to the statutory penalties for that offense in effect in 2007, before the Fair Sentencing Act of 2010, and because he has not previously moved for or received a reduction under the First Step Act of 2018, he is eligible for a sentence imposed in accordance with the Fair Sentencing Act of 2010.   Further, a reduction in his sentence is consistent with the intention of Congress to remedy the disproportionate impact of the mandatory minimum sentences applied to crack cocaine offenses before 2010.   If the Court is inclined to deny relief, Mr. Ingram requests that the court conduct a hearing at which Mr. Ingram is present.

Accordingly, Mr. Ingram requests that the Court exercise its discretion to reduce his sentence to time-served.

Respectfully submitted,
DARRYL INGRAM


By: _____/s/_____

Robert J. Wagner
Virginia State Bar Number: 27493
Office of the Federal Public Defender
701 East Broad Street, Suite 3600
Richmond, VA 23219
Telephone: (804) 565-0808
Fax: (804) 648-5033
Robert_Wagner@fd.org

-16-

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify that on March 31, 2020, I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

     Michael Moore
     US Attorney's Office
     SunTrust Building
     919 East Main Street
     Suite 1900
     Richmond, VA 23219

          By:       /s/
            Robert J. Wagner
            Virginia State Bar Number: 27493
            Office of the Federal Public Defender
            701 East Broad Street, Suite 3600
            Richmond, VA 23219
            Telephone: (804) 565-0808
            Fax: (804) 648-5033
            Robert_Wagner@fd.org